UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>KENNETH R. BURNETT,<br><br>                    Defendant. | CASE NO. CR17-0029JLR<br><br>ORDER DENYING DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I) |

## I.    INTRODUCTION

Before the court is Defendant Kenneth R. Burnett's motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  (Mot. (Dkt. # 46); Reply (Dkt. # 61).)  Plaintiff the United States of America (the "Government") opposes the motion.  (Resp. (Dkt. # 56).)  The court has considered the parties' submissions, the balance of the record, and the applicable law.  Being fully advised, the court DENIES Mr. Burnett's motion.

//

//

## II.   BACKGROUND

Mr. Burnett is a 50-year-old inmate who is currently detained at Federal Correctional Institution-Phoenix ("FCI-Phoenix"). (*See* Resp. at 4; Mot., Ex. 2 (Dkt. # 48 (sealed)) ("Medical Records") at 1.) On January 3, 2017, two individuals working undercover with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")—a confidential informant ("CI") and an ATF agent—met Mr. Burnett at his residence to acquire a firearm. (Presentence Investigation Report ("PSR") (Dkt. # 28 (sealed)) at 3-4.) Mr. Burnett showed them a loaded 12-gauge shotgun, a Norinco SKS rifle, and a Star Firestar 9-millimeter pistol. (*Id.* at 4.) At the same time, the CI discussed purchasing a half-ounce of heroin from Mr. Burnett. (*Id.*) After Mr. Burnett agreed to sell the CI a half-ounce of heroin, the CI paid Mr. Burnett and then returned later that day—again with the undercover agent—to pick up the heroin. (*Id.*) Approximately a week later, the ATF executed a search warrant on Mr. Burnett's property and arrested Mr. Burnett. (*Id.*) During his arrest, ATF agents seized 15.6 grams of methamphetamine, 0.8 grams of heroin, a Norinco SKS rifle, a Star Firestar 9-millimeter pistol, 200 bullets, and two digital scales. (*Id.*) Mr. Burnett was indicted on one count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (*See generally* Indictment (Dkt. # 11).)

On April 20, 2017, the parties entered into a plea agreement. (*See generally* Plea Agreement (Dkt. # 24).) As part of the plea agreement, the Government agreed not to

1    prosecute the possession of a firearm in furtherance of a drug trafficking crime charge.

2    (*See generally* Superseding Information (Dkt. # 20); Resp. at 3-4; Plea Agreement.)

3    Accordingly, Mr. Burnett pleaded guilty to one count of possession of methamphetamine

4    with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and one

5    count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (*See* Plea

6    Agreement ¶ 2.)  Pursuant to the terms of the plea agreement, the Government agreed to

7    recommend no more than 15 years of incarceration, and Mr. Burnett agreed to

8    recommend no less than 10.  (*See id.* ¶ 14.)

9        The U.S. Probation Office found Mr. Burnett's total offense level to be 25 based

10   on several factors, including:  a base offense level of 24; a two-level upward deviation for

11   the possession of three firearms; a two-level upward deviation for maintaining premises

12   for the purpose of manufacturing or distributing a controlled substance; and a three-level

13   downward deviation for acceptance of responsibility.  (*See* PSR at 6.)  It further found

14   Mr. Burnett's criminal history category to be III based on his:  (1) 2002 conviction for

15   carrying and possessing a firearm in furtherance of a drug trafficking crime; and (2) 2013

16   conviction for possession of heroin.  (*See id.* at 7-10.)  Thus, it calculated Mr. Burnett's

17   sentencing guidelines range as 70-87 months.  (*See id.* at 13.)

18       In its presentence report, the U.S. Probation Office also acknowledged the

19   significant benefits that Mr. Burnett received through the Government's "exercise of

20   charging discretion" in the plea agreement.  (*Id.* at 14.)  It noted that had Mr. Burnett

21   been convicted of the § 924(c) count (possession of firearm in furtherance of drug

22   trafficking) that the Government agreed to dismiss, "it would be his second [§ 924(c)]

1    conviction and, thus, the mandatory minimum prison sentence would have been 25 years,

2    which would have been required to run consecutively to the drug offense charged in

3    [Count 1] (a five-year mandatory minimum sentence offense)." (*Id.*)  Thus, "Mr. Burnett,

4    by virtue of the plea agreement, . . . avoided a 30-year mandatory minimum sentence (or

5    more had an additional § 924(c) count been charged as it could have been)." (*Id.*)

6         On September 5, 2017, the court sentenced Mr. Burnett to 10 years of

7    imprisonment and five years of supervised release.[1]  (Judgment (Dkt. # 40); 9/5/17 Min.

8    Entry (Dkt. # 39).)  Mr. Burnett did not appeal.  (*See generally* Dkt.)  He was remanded

9    into custody following his sentencing hearing, and his projected release date is October

10   22, 2025.  (*See* Judgment at 2; CR Memo. (Dkt. # 54 (sealed)) at 1; Resp. at 4.)

11        Mr. Burnett now seeks a reduction in sentence pursuant to 18 U.S.C.

12   § 3582(c)(1)(A),[2] asking the court to "reduce his sentence to a period of time within his

13   current [United States Sentencing Guidelines ("U.S.S.G.")] range of 63 to 78 months."[3]

14   (*See generally* Mot. at 2.)

---

[1] Consistent with the plea agreement, the Government recommended a sentence of 15 years and Mr. Burnett recommended a sentence of 10 years at the sentencing hearing.  (*See generally* Plea Agreement; Sentencing Tr. (Dkt. # 45).)  Additionally, the court adopted the U.S. Probation Office's sentencing guidelines calculation, finding that Mr. Burnett's total offense level was 25 and that he was in criminal history category III, resulting in guidelines range of 70-87 months.  (Sentencing Tr. at 26:18-20.)

[2] Mr. Burnett simultaneously filed a 28 U.S.C. § 2255 motion.  *See* 2255 Mot., *Burnett v. United States*, No. C22-0361JLR (W.D. Wash. Mar. 25, 2022), Dkt. 1

[3] To date, Mr. Burnett has served approximately 65 months in prison.  (Mot. at 5 (stating that "Mr. Burnett has served five years in prison as of January 11, 2022").)  Thus, reducing his sentence to 65 months or less would be equivalent to reducing his sentence to time served.

1

# III.   ANALYSIS

2      The court begins by setting forth the standard of review before turning to its

3  analysis of Mr. Burnett's motion.

4  **A.     Standard for a Reduction in Sentence**

5      A court generally may not correct or modify a prison sentence once it has been

6  imposed, unless permitted by statute or by Federal Rule of Criminal Procedure 35.

7  *United States v. Penna*, 315 F.3d 509, 511 (9th Cir. 2003); *see also Dillon v. United*

8  *States*, 506 U.S. 817, 824-25 (2010).  18 U.S.C. § 3582(c)(1), as amended by the First

9  Step Act of 2018, "allows certain inmates to seek a form of sentence modification,"

10  commonly referred to as compassionate release,[4] "by filing motions to that effect with the

11  district court."  *See United States v. King*, 24 F.4th 1226, 1228 (9th Cir. 2022); *Riley v.*

12  *United States*, No. C19-1522JLR, 2020 WL 1819838, at *5 (W.D. Wash. Apr. 10, 2020).

13  Under § 3582(c)(1), courts have the authority to reduce a sentence upon the motion of an

14  inmate if three conditions are met:  (1) the inmate has either exhausted their

15  administrative appeal rights of the Bureau of Prisons' ("BOP") failure to bring such a

16  motion on the inmate's behalf or has waited until 30 days after the applicable warden has

17  received such a request; (2) the inmate has established "extraordinary and compelling

18  reasons" for the requested sentence reduction; and (3) the reduction is consistent with

19

20  _____

   [4] "Although relief under § 3582(c) is commonly referred to as 'compassionate release,'
21  such relief is not limited to immediate release, but includes a reduction in sentence." *United*
   *States v. Millard*, No. CR-15-01391-PHX-DGC, 2022 WL 279596, at *2 n.1 (D. Ariz. Jan. 31,
22  2022) (quoting *United States v. Marks*, No. 03-cr-06033-L, 2020 WL 1908911, at *3 n.3
   (W.D.N.Y. Apr. 20, 2020)).

1  "applicable policy statements" issued by the United States Sentencing Commission.  *See*

2  18 U.S.C. § 3582(c)(1)(A)(i); *see also Riley*, 2020 WL 1819838, at *5.  It also instructs

3  the court to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when

4  deciding whether a reduction in sentence is appropriate.  18 U.S.C. § 3582(c)(1)(A).

5          The Sentencing Commission's policy statement referenced in 18 U.S.C.

6  § 3582(c)(1)(A)(i) provides, in relevant part, that a defendant may be eligible for

7  compassionate release if "extraordinary and compelling reasons warrant the reduction";

8  the "defendant is not a danger to the safety of any other person or to the community"; and

9  the "reduction is consistent with this policy statement."  U.S.S.G. § 1B1.13; *id.* cmt. n.1

10  (outlining four categories of circumstances that may constitute "extraordinary and

11  compelling reasons" for a sentence reduction).

12          The Ninth Circuit, however, has held that U.S.S.G. § 1B1.13 "is not an 'applicable

13  policy statement' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant."  *United*

14  *States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021).  Therefore, the "Sentencing

15  Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion

16  for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding."  *Id.*; *see also*

17  *United States v. Van Cleave*, No. CR03-0247RSL, 2020 WL 2800769, at *5 (W.D. Wash.

18  May 29, 2020) (referring to the policy statement as "persuasive, but not binding").

19  **B.    Exhaustion of Administrative Remedies**

20          Before considering the merits of Mr. Burnett's motion, the court must determine

21  whether he has met the statutory exhaustion requirement for a reduction in sentence.  *See*

22  18 U.S.C. § 3582(c)(1)(A).  Mr. Burnett, through his counsel, made a request for a

1  reduction in sentence to the warden at FCI-Phoenix on November 18, 2021, which was

2  denied on December 14, 2021.  (*See* Mot. at 2, Exs. 1A-1B.)  Mr. Burnett then filed this

3  motion in March 2022—more than 30 days after he submitted his request to the warden.

4  (*See generally* Mot.)  The court finds that the statutorily required 30-day period has

5  expired, and Mr. Burnett's motion is properly before the court.[5]

6  **C.   Extraordinary and Compelling Circumstances**

7          The court must next determine whether "extraordinary and compelling"

8  circumstances warrant a reduction of Mr. Burnett's term of imprisonment.  *See* 18 U.S.C.

9  § 3582(c)(1)(A)(i).  Mr. Burnett bears the burden of establishing that "extraordinary and

10  compelling reasons" exist that justify a reduction in sentence.  *See United States v.*

11  *Suryan*, No. CR19-0082RAJ, 2021 WL 3510423, at *2 (W.D. Wash. Aug. 10, 2021).

12  Mr. Burnett argues that he is entitled to a reduction in sentence because:  (1) his age and

13  weight make him "vulnerable to COVID-19 complications" and his hypothyroidism[6] is

14  being inadequately treated by the BOP; (2) had he been charged after the "First Step Act,

15  [he] would not face 'stacked' sentences resulting from multiple Section 924(c)

16  convictions"; (3) since being sentenced, his advisory guidelines range has gone down

17  because his criminal history category went down by one level after his 2013 state

18

19          [5] The Government agrees that Mr. Burnett complied with § 3582(c)(1)(A)'s exhaustion
   requirement.  (*See* Resp. at 6.)

20

21          [6] In Mr. Burnett's motion, he claims that he suffers from hyperthyroidism.  (*See* Mot. at
   4.)  However, his medical records establish that he has been diagnosed with hypothyroidism, a
   different condition.  (*See* Medical Records at 1, 24; *see also* Resp. at 12 n.18.)  Accordingly, the
   court refers to his condition as hypothyroidism rather than hyperthyroidism throughout this
22  order.

1   conviction for possession of heroin was vacated; and (4) "the pandemic has created

2   harsher prison conditions than what [he] would have otherwise experienced during

3   pre-pandemic times." (*See generally* Mot. at 7-10.)  The court addresses each argument

4   individually before addressing whether Mr. Burnett's arguments, taken together, present

5   extraordinary and compelling reasons warranting a sentence reduction.

6       1.   COVID-19 Vulnerability and Management of Medical Condition

7       Mr. Burnett argues that his medical conditions amount to "extraordinary and

8   compelling reasons" warranting his release.  (*See* Mot. at 7-8; Reply at 3-4.)  Specifically,

9   he argues that:  (1) his age and weight make him more susceptible to suffering severe

10  complications from COVID-19; and (2) the BOP is inadequately treating his

11  hypothyroidism.  (*See* Mot. at 7-8; Reply at 3-4.)  The court addresses each argument in

12  turn.

13      A review of Mr. Burnett's medical records reveals that he has a body mass index

14  ("BMI") of 28.2, which is considered overweight.  (*See* Medical Records at 118

15  (providing Mr. Burnett's weight as of April 2021); PSR at 12 (listing Mr. Burnett's

16  height as 6'2")); *see also United States v. Slaughter*, No. CR13-0359RSL, 2021 WL

17  2400866, at *2 (W.D. Wash. June 11, 2021) (citing *Adult BMI Calculator*, CDC,

18  https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi

19  _calculator.html (last visited June 30, 2022) (calculating a person's BMI using their

20  height and weight)).  The CDC has recognized that individuals who are overweight or

21  obese may be more likely to get severely ill from COVID-19.  *See United States v.*

22  *Rollness*, No. CR06-0041RSL, 2021 WL 4476920, at *5 (W.D. Wash. Sept. 30, 2021)

1    (citing *People with Certain Medical Conditions*, CDC (May 2, 2022),

2    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

3    medical-conditions.html (defining overweight as a BMI between 25 and 30 and stating

4    that the "risk of severe illness from COVID-19 increases sharply with higher BMI")).

5    Mr. Burnett's medical records also indicate that he is 50.  (*See* Medical Records at 1.)

6    The CDC "recognizes that the risk of severe illness from COVID-19 increases with age

7    but makes clear that people in their 50s have a lower risk for severe infection than

8    individuals in their 60s, 70s, or 80s."  *See United States v. Meza-Orozco*, No.

9    CR14-5246BHS, 2021 WL 3630519, at *3 & n.3 (W.D. Wash. Aug. 17, 2021) (citing

10   *Older Adults*, CDC (Aug. 4, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-

11   extra-precautions/older-adults.html ("People 85 or older are the most likely to get very

12   sick.")).

13          Although Mr. Burnett establishes that he may be more likely to suffer severe

14   complications from COVID-19 due to his age and weight, that risk is significantly

15   lessened by that fact that Mr. Burnett has received two doses of the Moderna COVID-19

16   vaccine.  (*See* Medical Records at 31); *see also United States v. Grummer*, 519 F. Supp.

17   3d 760, 763 (S.D. Cal. 2021) (collecting cases concluding that the risks posed by

18   COVID-19 are lessened through vaccination).  While no vaccine is 100% effective,

19   studies from the Centers for Disease Control and Prevention indicate that Mr. Burnett's

20   risk of infection is low given his vaccination status and, furthermore, that vaccination

21   //

22   //

reduces his risk of severe illness if he were to become infected.[7]  *See United States v. Posey*, No. CR18-0280RSL, 2021 WL 4745523, at *5-6 (W.D. Wash. Oct. 12, 2021) (citing *Benefits of Getting Vaccinated*, CDC (June 19, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html); *Meza-Orozco*, 2021 WL 3630519, at *4 ("[A]ll vaccines are effective against severe illness, hospitalization, and death."  (citing *What You Need to Know about Variants*, CDC (Apr. 26, 2022), https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html)).  Accordingly, although Mr. Burnett's slightly elevated BMI and age increase his risk of developing severe complications from COVID-19, the court concludes that this risk is significantly lessened because of Mr. Burnett's vaccination status and thus does not amount to an extraordinary and compelling reason to reduce his sentence.  *See, e.g.*, *United States v. Stringer*, No. CR18-0157RAJ, 2021 WL 3565430, at *3 (W.D. Wash. Aug. 12, 2021) ("While no vaccine is 100% effective, it substantially reduces the likelihood of Mr. Stringer contracting the virus" and protects against the risk of "developing severe complications . . . should he become infected," even in light of his diabetes and

---

[7] *See, e.g.*, *United States v. Bolden*, No. CR13-0201RSM, 2021 WL 3269636, at *4-6 n.1 (W.D. Wash. July 30, 2021) (first citing *COVID-19 Vaccines Work*, CDC (June 28, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html; then citing *Reinfection with COVID-19*, CDC (Jan, 20, 2022), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html; and then citing *The Possibility of COVID-19 after Vaccination: Breakthrough Infections*, CDC (June 23, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html); *United States v. Meyer*, No. 1:14-CR-00148-01-MC, 2021 WL 1895240, at *2 (D. Or. May 11, 2021) ("The [Moderna] vaccine appeared to have high effectiveness in clinical trials (efficacy) among people of diverse age, sex, race, and ethnicity categories and *among persons with underlying medical conditions*."  (emphasis in original) (citing *Moderna*, CDC (June 24, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html)).

1   hypertension.); *Grummer*, 519 F. Supp. 3d at 763 (finding that the defendant did not

2   demonstrate extraordinary and compelling reasons for release because, while he was at

3   risk for developing severe complication from COVID-19 due to his age and several

4   chronic medical conditions, "his vaccination significantly mitigates the risk that he will

5   contract COVID-19").

6          Additionally, although Mr. Burnett's medical records also confirm that he suffers

7   from hypothyroidism (*see* Medical Records at 1, 24), the CDC has not defined

8   hypothyroidism as a condition that makes an individual more likely to get severely ill

9   from COVID-19.  *See People with Certain Medical Conditions*, *supra*; *see also United*

10  *States v. Leonard*, No. CR1508076004PCTDGC, 2021 WL 5177862, at *3 (D. Ariz.

11  Nov. 5, 2021).  As such, Mr. Burnett instead contends that the BOP's inadequate

12  treatment of his hypothyroidism amounts to an extraordinary and compelling reason for a

13  reduction in sentence.  (*See* Mot. at 4, 7; Reply at 3-4 (discussing Mr. Burnett's high

14  thyroid stimulating hormone ("TSH") levels and alleging that he has a high heart rate and

15  heart palpitations when on his hypothyroidism medication).)  However, "[c]hronic but

16  manageable medical conditions alone do not constitute extraordinary and compelling

17  circumstances." *United States v. Miller*, No. 15-CR-00471-CRB-1, 2021 WL 2711728,

18  at *4 (N.D. Cal. July 1, 2021); *United States v. Lii*, No. CR 07-00423 HG-01, 2021 WL

19  5828370, at *4 (D. Haw. Dec. 8, 2021).  Mr. Burnett's medical records do not

20  demonstrate that the BOP is unable to manage or has refused to treat Mr. Burnett's

21  hypothyroidism in a way that is extraordinary and compelling.  Rather, his medical

22  records demonstrate that:  (1) Mr. Burnett is prescribed medication for his

1    hypothyroidism and regularly undergoes testing regarding his condition; (2) Mr. Burnett

2    has on numerous occasions informed the BOP that his hypothyroidism medication is

3    making his heart rate increase and has stopped taking the medication; and (3) each time

4    Mr. Burnett complains or stops taking his medication, the BOP meets with Mr. Burnett,

5    orders testing if necessary, and changes Mr. Burnett's dosage.  (*See, e.g.*, Medical

6    Records at 32-33, 1-18 (noting that the BOP has also taken steps to ensure that Mr.

7    Burnett complies with taking his hypothyroidism medication).)

8         While the court is sympathetic to Mr. Burnett's medical issues and concerns and

9    acknowledges that his medical records reflect high TSH levels, this case is not analogous

10   to those in which the defendant's medical conditions, "by their nature, cannot be treated

11   effectively in prisons," *Miller*, 2021 WL 2711728, at *4, or where the BOP has refused to

12   treat the defendant's medical conditions.  *See, e.g.*, *United States v. Rodriguez*, 424 F.

13   Supp. 3d 674, 682 (N.D. Cal. 2019) (collecting cases regarding conditions that cannot be

14   treated effectively in prison); *United States v. Bisel*, No. 10CR5016-H, 2021 WL

15   3634830, at *4 (S.D. Cal. Aug. 16, 2021); *United States v. Waxman*, No.

16   CR18-0175RSL, 2021 WL 4148180, at *6 (W.D. Wash. Sept. 13, 2021).  Moreover, the

17   court notes that Mr. Burnett has alternative legal avenues for redressing constitutionally

18   inadequate medical care.  *See Miller*, 2021 WL 2711728, at *4 (stating that "[p]risoners

19   routinely bring constitutional claims based on inadequate medical care" under the Eighth

20   Amendment).  Accordingly, the court concludes that Mr. Burnett has not established that

21   the BOP's treatment of his hypothyroidism is an extraordinary and compelling

22   circumstance warranting a reduction in sentence.

1      In sum, the court concludes that Mr. Burnett's risk of developing severe

2  complications from COVID-19 and the BOP's treatment of his hypothyroidism, when

3  considered individually or together, do not amount to extraordinary and compelling

4  reasons justifying a sentence reduction.

5      2.  <u>First Step Act and Stacked Sentences</u>

6      Mr. Burnett contends that Congress's modification of the operation of the

7  "stacking" provisions of 18 U.S.C. § 924(c), a "benefit" that he did not have when

8  negotiating with the Government, warrants a sentence reduction.  (Mot. at 8.)  He claims

9  that, had he been charged today, "there is no possibility that he would or could face a

10  mandatory minimum of 55 years as the government threatened back in 2017"[8] because

11  "Section 403 of the First Step Act did away with the 'stacking' of § 924(c) penalties

12  resulting from multiple § 924(c) counts charged in the same indictment."  (*Id.*)  The

13  Government argues that:  (1) Mr. Burnett misunderstands the change to the "stacking"

14  provisions, and that the changes would not have impacted the possible sentence that he

15  faced; and (2) even if the change to the "stacking" provisions would have lessened the

16  potential sentence that Mr. Burnett faced, such a change does not warrant a sentence

17  reduction.  (Resp. at 13-15.)

18

---

19      [8] Mr. Burnett's reference to a 55-year mandatory minimum sentence is based on:  (1) the
five-year mandatory minimum that he faced for the drug offense charged in Count 1 of the

20  indictment; (2) the 25-year mandatory minimum that he faced for the § 924(c) offense charged in
Count 2 of the indictment, which would have been required to run consecutively to the Count 1

21  offense; and (3) the 25-year mandatory minimum that he would have faced for an additional
§ 924(c) offense that "could have been" charged, which would have been required to run
consecutively to the Count 1 and Count 2 offenses.  (*See generally* PSR at 13-14; Indictment;

22  Resp. at 15-16.)

1    At the time Mr. Burnett was sentenced, 18 U.S.C. § 924(c)[9] established a

2    mandatory minimum of at least five years[10] of imprisonment for a defendant's first

3    § 924(c) conviction, as well as longer mandatory minimum penalties, generally requiring

4    25 years of imprisonment, for each "second or subsequent [§ 924(c)] conviction."  18

5    U.S.C. § 924(c)(1) (2006).  The Supreme Court interpreted the phrase "second or

6    subsequent conviction" to mean that prosecutors could "stack" multiple counts of

7    § 924(c) violations, which resulted in defendants without previous § 924(c) convictions

8    being charged for both a first offense—carrying a 5-year mandatory minimum, to be

9    served consecutively—and a "second or subsequent offense"—carrying a mandatory

10   25-year sentence, to be served consecutively—in the same indictment.  *See United States*

11   *v. Jones*, 482 F. Supp. 3d 969, 978 (N.D. Cal. 2020) (citing *Deal v. United States*, 508

12   U.S. 129, 131-32 (1993) (stating that any additional convictions of an offense under

13   § 924(c), whether they occur in the same proceeding as the first conviction or not, are

14   "second or subsequent" to the first such conviction), *superseded by statute*, First Step Act

15   of 2018, Pub. L. No. 115-391, § 403, 132 Stat. 5194 (Dec. 21, 2018)).  As such, someone

16   convicted of two § 924(c) counts in a single proceeding automatically faced a "stacked"

17   mandatory minimum sentence of 30 years.  *Id.*

18

19   ───────────────

20   [9] 18 U.S.C. § 924(c) establishes the offense of using or carrying a firearm during and in relation to, or possessing a firearm in furtherance of, a crime of violence or a drug trafficking crime.

21   [10] The statute provides for increasingly longer mandatory minimum penalties for a defendant's first § 924(c) conviction based on how the firearm was used and the type of firearm involved.  *See, e.g.*, 18 U.S.C. § 924(c)(1)(A)(ii)-(iii).

22

1    As part of the First Step Act, Congress eliminated, as to first time offenders, the

2    25-year mandatory minimum "stacking" for multiple § 924(c) offenses within in the same

3    indictment.[11]  *See United States v. Voris*, 964 F.3d 864, 873-74 & n.9 (9th Cir. 2020)

4    (examining pre- and post-First Step Act mandatory minimum sentences for five § 924(c)

5    convictions); *see also United States v. Wells*, No. 214CR00280JCMGWF, 2022 WL

6    1720987, at *2 (D. Nev. May 27, 2022) (same).  In the Act, Congress amended the text

7    § 924(c)'s stacking provision by striking the language "second or subsequent conviction

8    under this subsection" and substituting in "violation of this subsection that occurs after a

9    prior conviction under this subsection has become final."  First Step Act § 403(a); *see

10   also id.* § 403(b) (declining to make the amendment retroactive).  Thus, after the First

11   Step Act, if a defendant is convicted of his first and second § 924(c) offense in the same

12   proceeding, the mandatory minimum would be five years on each of those counts, to be

13   served consecutively, for a total of ten years.[12]  *Id.* § 403(a); *Quinn*, 467 F. Supp. 3d at

14   827-28; 18 U.S.C. § 924(c)(1).  However, if a repeat offender—that is, someone who

15   carries out an additional § 924(c) offense after having already been convicted of one—is

16   convicted of two § 924(c) offenses in the same proceeding, the mandatory minimum

17

18

19   [11] To be clear, the First Step Act did not completely do away with mandatory minimum
     "stacking" for first time offenders in the sense that the mandatory minimum for each § 924(c)

20   conviction in the same proceeding must still be served consecutively.  *See* 18 U.S.C.
     § 924(c)(1)(D)(ii).

21   [12] Before the First Step Act, this defendant would have faced a total of 30 years:  5 years
     for the first § 924(c) conviction and 25 years for the second § 924(c) conviction, to be served

22   consecutively.  *See, e.g.*, *United States v. Quinn*, 467 F. Supp. 3d 824, 827-28 (N.D. Cal. 2020).

1  would still be 25 years on each of those additional § 924(c) convictions, to be served

2  consecutively, for a total of fifty years.  First Step Act § 403(a); 18 U.S.C. § 924(c)(1).

3        Here, Mr. Burnett was first convicted of a § 924(c) violation (possession of

4  firearm in furtherance of drug trafficking) in 2002.  *See* Judgment, *United States v.*

5  *Burnett*, No. CR02-0162RSL (W.D. Wash. Oct. 24, 2022), Dkt. 93.  He was sentenced on

6  October 24, 2002, and never appealed or collaterally attacked the judgment, so Mr.

7  Burnett's first § 924(c) conviction had been final for almost 15 years by the time he was

8  sentenced in this case.  *See generally id.*; (Judgment).  Thus, had Mr. Burnett been

9  convicted of the single count of possession of a firearm in furtherance of a drug

10  trafficking crime, as was originally charged, he would have faced a mandatory minimum

11  sentence of 25 years on that count because of his prior, final § 924(c) conviction—

12  regardless of whether he was sentenced before or after enactment of the First Step Act.

13  *See* First Step Act § 403(a); 18 U.S.C. § 924(c)(1).  Similarly, regardless of when Mr.

14  Burnett was sentenced, if the Government had charged an additional § 924(c) count in

15  this case, and if Mr. Burnett had thus been convicted of two § 924(c) offenses, he would

16  have faced a mandatory minimum sentence of 50 years on those counts[13]—as each

17  additional § 924(c) conviction carries a 25-year mandatory minimum, to be served

18  consecutively.  18 U.S.C. § 924(c)(1).  Accordingly, the changes to § 924(c)'s "stacking"

19  provision have no impact on the possible sentence that Mr. Burnett faced.  For that

20

21        [13] In total, Mr. Burnett would have faced a 55-year mandatory minimum sentence

22  because of the 5-year mandatory minimum that Mr. Burnett faced for the drug offense charged in
Count 1 of the indictment.  (*See generally* PSR at 13-14; Indictment.)

1   reason, the court finds that Congress's amendment to § 924(c)'s "stacking" provision

2   does not present an extraordinary and compelling basis for a reduction in sentence in this

3   case.

4          3.  Change in Criminal History Category Due to Change in Law

5          Mr. Burnett next claims that he is entitled to a sentence reduction because his

6   federal sentencing guidelines calculation was based on a state conviction that has since

7   been vacated on constitutional grounds.  (Mot. at 8-9; *id.*, Ex. 5.)  The vacatur and

8   dismissal of his 2013 state conviction for possession of heroin, pursuant to the

9   Washington State Supreme Court's *State v. Blake*, 481 P.3d 521 (2021) decision,

10  eliminates two of his five criminal history points, reducing his criminal history category

11  from III to II and his advisory guidelines range from 70-87 months to 63-78 months.  (*Id.*

12  at 8-9.)  The Government argues that this change in Mr. Burnett's advisory guidelines

13  range "is not an extraordinary and compelling reason to change [his] sentence" because:

14  (1) "[c]ompassionate release is not a tool to correct a judgment" (Resp. at 16 (quoting

15  *United States v. Crawford*, No. CR16-5303RBL, 2020 WL 47912645, at *3 (W.D. Wash.

16  Aug. 18, 2020))); and (2) Mr. Burnett's sentence was based on the plea agreement that he

17  "voluntarily entered to avoid risking a 55-year mandatory minimum sentence" rather than

18  the applicable guidelines range (*id.* ("[Mr. Burnett] worked out a plea deal to avoid a

19  55-year sentence by agreeing to a ten-year sentence.  The court gave [him] exactly what

20  he asked for.")).

21         Mr. Burnett concedes in his reply brief that his "criminal history reduction is not,

22  in itself, an extraordinary and compelling circumstance."  (Reply at 2-3.)  The court

ORDER - 17

1   agrees.  The court previously rejected Mr. Burnett's arguments on this point, which were

2   raised as a habeas claim, and does not revisit them at this time.  *See* 6/27/22 Order,

3   *Burnett v. United States*, No. C22-0361JLR (W.D. Wash. June 27, 2022), Dkt. 12.[14]  The

4   court, however, notes that its reasons for rejecting Mr. Burnett's arguments in the habeas

5   context are equally applicable to its conclusion that the changes in his criminal history

6   category and advisory guidelines range are not extraordinary and compelling

7   circumstances justifying a sentence reduction.

8           4.   Conditions of Confinement at FCI-Phoenix

9           Mr. Burnett argues that COVID-19's impact on his conditions of confinement

10  warrants a reduction in sentence.  (*See* Mot. at 9-10.)  He contends that with the

11  COVID-19 pandemic, "individuals have been forced to isolate or quarantine with their

12  movement restricted" and have had their visitation privileges "restricted if not cancelled

13  altogether."  (*Id.* at 9 ("The nationwide BOP lockdowns over the past two years due to

14  COVID have created a maximum security environment for practically every inmate

15

16      [14] During sentencing, the court noted that Mr. Burnett's was "unusual" because the
    parties "agreed[, pursuant to the plea agreement,] to make recommendations to the court greater
17  than [the applicable guidelines] range"—Mr. Burnett recommended 120 months and the
    Government recommended 180 months.  (*See* Sentencing Tr. at 26:18-23, 3:7-9, 4:7-9, 13:19-24;
18  *see also* Plea Agreement ¶ 14.)  After evaluating the parties' recommendations in light of the 18
    U.S.C. § 3553(a) factors, the court ultimately concluded that the § 3553(a) factors supported Mr.
19  Burnett's recommendation of 120 months—"a sentence which is sufficient but not greater than
    necessary" to achieve the goals of sentencing.  (*See, e.g.*, Sentencing Tr. at 27:4-31:5.)  Because
20  the court chose to adopt Mr. Burnett's significantly above-guidelines recommendation in light of
    the § 3553(a) factors, the court concluded that there was no reasonable probability that it would
21  have sentenced Mr. Burnett to less than 120 months had his advisory guidelines range been 7-9
    months shorter.  6/27/22 Order at 11-14, *Burnett*, No. C22-0361JLR.  Accordingly, the court
22  denied Mr. Burnett's habeas motion because he had not established actual prejudice to overcome
    his procedural default.  *Id.* at 15.

1     regardless of classification.").)  The "constant lockdowns and other unusually severe

2     conditions," he alleges, have made "the conditions of confinement much harsher" for him

3     and "could not have been foreseen" by this court during his sentencing.  (*Id.* at 9-10.)

4         The court need not reiterate the widely known information regarding the

5     symptoms of COVID-19, the devastating global impact of the virus, and the

6     unprecedented challenges COVID-19 created for federal prisons.  *See Rollness*, 2021 WL

7     4476920, at *4 (discussing COVID-19's impact on prisons).  Moreover, the court does

8     not discount the dangers associated with COVID-19 nor the difficulties prisons face in

9     preventing and containing outbreaks.

10        However, "general conditions that affect inmates indiscriminately throughout the

11     prison are insufficient to support an individual defendant's claim for compassionate

12     release." *United States v. Bolden*, No. CR16-0320RSM, 2020 WL 4286820, at *7 (W.D.

13     Wash. July 27, 2020); *United States v. Thomas*, No. 3:17-CR-00051-SLG, 2021 WL

14     3924724, at *2 (D. Alaska Sept. 1, 2021) ("[E]very BOP inmate—and in fact nearly

15     every incarcerated person—has experienced limitations on their ability to communicate,

16     exercise, gain an education, and receive job skills training during the COVID-19

17     pandemic.  Conditions that are shared by nearly every inmate in the country are not

18     "extraordinary and compelling," and the restrictions Mr. Thomas is subject to are in no

19     way unique to him.").  Courts have also rejected generalized claims "that [a defendant's]

20     period of incarceration, served during the time of Bureau of Prisons' COVID-19

21     restrictions, has presented harsher punishment and made this past year more difficult."

22     *See Suryan*, 2021 WL 3510423, at *3 (stating that BOP lockdown "conditions, while

1   challenging, do not present an extraordinary and compelling reason to warrant his early

2   release"); *United States v. Becerra*, Case No. 17cr1465-LAB, 2021 WL 461699, at *2

3   (S.D. Cal. Feb. 8, 2021) ("The inconvenience caused by extended lockdown is not an

4   'extraordinary and compelling reason.'").  While Mr. Burnett's conditions of

5   confinement at FCI-Phoenix have been more challenging than the court could have

6   predicted, this is a generalized claim that every inmate who has been in custody could

7   assert and is not unique to Mr. Burnett.  Accordingly, the court finds that Mr. Burnett's

8   conditions of confinement do not constitute "extraordinary and compelling"

9   circumstances warranting a reduction in sentence.  *See Suryan*, 2021 WL 3510423, at *3.

10          The court further finds that, even when Mr. Burnett's arguments are considered

11   together, he has not established "extraordinary and compelling" reasons justifying a

12   reduction in sentence.[15]  Therefore, the court DENIES Mr. Burnett's motion.

13                          **IV.    CONCLUSION**

14          For the foregoing reasons, the court DENIES Mr. Burnett's motion to reduce

15   sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Dkt. # 46).

16          Dated this 2nd day of July, 2022.

17

18                                                      _____

19                                                      JAMES L. ROBART
                                                        United States District Judge
20

---

21   [15] Having determined that Mr. Burnett has not made the requisite showing of
     extraordinary and compelling reasons warranting a reduction in sentence, the court need not
22   analyze whether a reduction in Mr. Burnett's sentence would be consistent with the factors set
     forth in 18 U.S.C. § 3553(a).